1998 SD 54

The PEOPLE of the State of South
Dakota in the Interest of T.G.
and C.G., Children,

And Concerning S.G., C.H. and D.C.

No. 20304.

Supreme Court of South Dakota.

Considered on Briefs May 7, 1998.

Decided May 27, 1998.

Mark W. Barnett, Attorney General, Joan P. Baker, Assistant Attorney General, for appellee State of South Dakota.

Mitchell D. Johnson, Rapid City, for appellant S.G., Mother.

Timothy J. Rensch of Rensch Law Office, Rapid City, for appellees T.G. and C.G., Children.

PER CURIAM.

[¶ 1.] In this case, we affirm the termination of parental rights of a mother who failed to protect her daughters from sexual abuse, attempted to conceal the abuse, and chose to continue living with the perpetrator of that abuse.

## FACTS

[¶ 2.] The evidence indicates that: thirty-year-old Mother is the product of an abusive childhood. She lived with her alcoholic mother until she was four years old. She recalls being thrown, starved and locked in cupboards by her mother, and abused by her mother's boyfriends. Her mother "sold" her to adoptive parents for $1500 and these parents began sexually abusing her at age seven. Mother gave birth to her first child when she was thirteen. The child, fathered by adoptive father, was placed for adoption. Mother was placed in a residential home until she graduated from high school after completing a special education curriculum. When she was eighteen, she gave birth to her second child, the product of a rape. The baby died the day after birth.

[¶ 3.] Mother and Father * lived together from 1986 and 1993 when Mother left due to his violence, drug use, and schizophrenia. They had four children. Older Daughter was born in 1987 and Younger Daughter was born in 1988. They are the children involved in this appeal. Two younger children are awaiting adoption.

[¶ 4.] During the time that Mother and Father lived together the Department of Social Services (DSS) substantiated a neglect referral that Older Daughter failed-to-thrive. Services appropriate to Mother's level of understanding were provided. DSS received five other referrals regarding physical abuse of the children, but was not able to substantiate the allegations.

[¶ 5.] In 1993, shortly after she left Father, Mother and her two daughters began living with Stepfather, whom Mother married in 1996. Stepfather, now thirty-two, was also sexually molested as a child and began using marijuana and alcohol when he was fourteen. In 1987 he was sentenced to four years in the penitentiary for sexually molesting a seven-year-old girl.

[¶ 6.] Between 1994 and 1997 DSS received three referrals that Stepfather was sexually molesting both daughters. He and the children denied it. A 1995 report, however, substantiated that the girls had been sexually abused by someone outside of the home. Despite her knowledge of this, Mother later allowed a man that she knew had sexually abused a friend's children take her daughters on a three day trip.

[¶ 7.] On February 9, 1997, Mother told a girlfriend that Stepfather had sexually molested Older Daughter. The friend took Mother and daughters to the sheriff's office where statements were taken. When Mother insisted on returning to Stepfather, the friend refused to allow the children to go with her.

[¶ 8.] A social worker and law enforcement official interviewed each daughter and the friend the next day. Both daughters described how Stepfather had touched them in their private parts and told them that he would kill them or go to the penitentiary if they told. The friend told of hearing Mother tell Older Daughter not to tell what happened and overheard Stepfather tell Mother to coach the children on what to say so he would not return to prison. A week later, a medical examination of both daughters found physical evidence of sexual abuse.

[¶ 9.] Stepfather denied abusing the girls, threatening them, or asking Mother to cover up the abuse. He admitted giving Older Daughter a "hickey" the night before the abuse was reported. He also admitted that he wrestled with the girls until he got an erection on occasions when Mother refused to have sex with him.

* Father voluntarily terminated his parental rights and is not involved in this appeal.

[¶ 10.] Mother admitted that Stepfather had given Older Daughter a "hickey," but claimed it was accidental. She believed that the situation had been exaggerated. She did remember, however, that Stepfather asked her to perform fellatio on him in front of her daughters after he had played with them.

[¶ 11.] Mother and Stepfather entered into separate Family Service Agreements with DSS. Stepfather's cooperation with DSS was minimal but he did complete a psychological evaluation. The conclusion provided that Stepfather's prognosis was poor due to his low mental functioning and great amount of minimization. The evaluator believed he should not have contact with *any* children and that these children would be at great risk if returned to his home since Mother was unable or unwilling to protect them.

[¶ 12.] Mother's FSA had five objectives. She was to attend and complete an individual parenting class. This class was taught by a woman who knew Mother's limitations because she had worked with her on failure-to-thrive issues. Mother was eventually dropped from the program because she missed nine weeks; normally parents are dropped after three misses. Mother did complete a psychological evaluation and did begin counseling, with sporadic attendance. She was not consistent in attending co-dependency meetings. Although she did attend twenty-one of twenty-eight visitations with her daughters, her interaction was minimal, and harsh, and she cut visits short. During this period, her relationship with Stepfather was volatile. Ultimately she chose to remain with him and bear his child. She remains ambivalent as to whether Stepfather had sexual contact with her daughters.

[¶ 13.] Oldest Daughter was a failure-to-thrive child. She was first sexually abused at age seven. She now functions in the mildly retarded range of intelligence; her full scale IQ is 59. She is intensely jealous of her sister, idealizes her mother, and struggles with rejection because of her lack of friends. She does not deny Stepfather's abuse of her. Younger Daughter's full scale IQ is 104. Due to a learning disability, her skills range from low average to superior. Depression is a major factor in her functioning and she expresses a strong need for security, support and affection. She refuses to discuss sexual abuse by Stepfather and denies substantiated abuse by another.

[¶ 14.] Both girls miss their mother and are protective of her. Their therapist noted that termination of Mother's parental rights would be painful for these girls, as it would for most children. Because of the abuse and neglect that they have experienced throughout their lives, the therapist believed that a permanent or foster home would provide the stability and security that Mother's home lacked. In addition, daughters were doing well in foster care where the caregivers were able to focus on the children's needs rather than their own needs as mother did.

[¶ 15.] The trial court concluded that the least restrictive alternative available was the termination of Mother's parental rights.

## DECISION

[¶ 16.] It is our task to determine whether the trial court was clearly erroneous in finding by clear and convincing evidence that the termination of Mother's parental rights was in the children's best interest as the least restrictive alternative available. *Matter of L.A.*, 507 N.W.2d 83 (S.D.1993). In doing so, we recognize that the termination of parental rights is a drastic, final step that must be exercised cautiously. *In re S.H.*, 337 N.W.2d 179 (S.D.1983). However, the best interests of the children must always prevail. *In Interest of A.D.*, 416 N.W.2d 264 (S.D.1987). This Court will not set aside the trial court's findings of fact unless clearly erroneous and we give due regard to the trial court's opportunity to judge the credibility of the witnesses. *Id.*, 416 N.W.2d at 267. Our review of the record in this case clearly indicates that the trial court did not err and termination of Mother's parental rights was the least restrictive alternative available.

[¶ 17.] The trial court found that the children were abused and that Mother ignored the abuse, and, when aware of it, concealed it and attempted to have the children do so. Because Mother did not physically or sexually abuse daughters, she contends that there is no evidence to support these findings.

[¶ 18.] "The mother's contention that some type of physical abuse or neglect are [sic] required to justify termination is spurious." *Matter of D.H.*, 354 N.W.2d 185, 191 (S.D.1984). A court may terminate parental rights "if the court finds, by clear and convincing evidence, that the least restrictive alternative available commensurate with the best interests of the child with due regard for the rights of the parents, the public and the state so requires." SDCL 26–8A–27. There is no statutory requirement for physical abuse. SDCL 26–8A–2. In addition, a child "[w]ho is subject to sexual abuse, sexual molestation or sexual exploitation by the child's parent, guardian, custodian *or any other person responsible for the child's care*" is an abused or neglected child. SDCL 26–8A–2(8). (emphasis added).

[¶ 19.] In this case, while Mother did not physically or sexually abuse her daughters she knew of the substantiated report of sexual abuse and allowed her daughters to travel with a known sexual abuser. She knew that Stepfather had been convicted of molesting a child, and chose to live with him and expose her daughters to him. She was aware of allegations that Stepfather was abusing her daughters, and did nothing to alleviate the situation. While she did tell a friend that Stepfather sexually abused daughters, she immediately backtracked and attempted to stop the children from discussing the abuse with authorities. This evidence supports the trial court's findings; they are not clearly erroneous.

[¶ 20.] The trial court also found that DSS had made reasonable efforts to reunite Mother with her children. Mother contends that these efforts were not reasonable in light of her dysthymia, post traumatic stress disorder, and borderline intellectual functioning.

[¶ 21.] This Court recognizes that the fundamental nature of parental rights mandates a reasonable effort to aid them in maintaining their offspring; however, the best interests of the children must always prevail. *In Interest of A.D.*, 416 N.W.2d at 268. Exhaustion of every possible form of assistance is not required. *Id. Matter of S.T.B.*, 499 N.W.2d 903 (S.D.1993).

[¶ 22.] The record indicates that DSS was aware of Mother's level of functioning and attempted to provide services appropriate to those needs. Mother's cooperation with DSS efforts was minimal, her attendance was poor, and her attitude, indifferent. Termination is appropriate where services are unaccepted or unsuccessful. *Matter of S.T.B.*, 499 N.W.2d at 905.

[¶ 23.] The trial court also found that Mother "has chosen a relationship with a child molester, who has molested her children, over the welfare of her children." Mother contends that DSS should have mandated the severance of her relationship with Stepfather.

[¶ 24.] The trial court, DSS, and her own attorney continually warned Mother that her continuing relationship with Stepfather was jeopardizing her ability to regain her children. At one point during these proceedings the trial court even ordered Stepfather to have no contact with Mother, except by logged telephone calls, and no contact with daughters. While the latter was successful, the former was not because Mother continually went back to Stepfather. Because of Mother's ongoing choice, DSS attempted to work with Stepfather, but he steadfastly refused to cooperate. Even as she was faced with the prospect of having her parental rights terminated, Mother chose to stay with Stepfather. *Matter of D.A.B.*, 313 N.W.2d 787, 788 (S.D.1981) is apt:

> It is true that appellant has not abused the child. At the dispositional hearing, however, she testified that she was still associating with the abusive stepfather on a regular basis. The trial court found that potential harm would result if the parent-child relationship were to continue under these circumstances. Little purpose is served if a dependent and neglected child remains in such a potentially injurious environment. *See Matter of L.M.T., supra* [305 N.W.2d 399]; *People in Interest of T.L.J., supra* [303 N.W.2d 800]. These considerations made the termination of appellant's parental rights the only alternative the trial court had to protect the child.

[¶ 25.] The record is clear that Mother is incapable of placing her children's significant needs beyond those of her own. When

aware of the sexual abuse throughout their young lives, Mother ignored it, attempted to conceal it, and failed to protect the children from it. She chose a sexual abuser over her own daughters, despite DSS attempts to help her. Daughters have significant problems which need consistent, stable help if they are ever to have a chance at independent living. Mother cannot provide this.

[¶ 26.] Affirmed.

[¶ 27.] MILLER, C.J., and SABERS, AMUNDSON, KONENKAMP, and GILBERTSON, JJ., participating.